GRABILL *v.* BARNHART BROS. & SPINDLER.[1]

1. SALES — WARRANTY — FITNESS FOR PURPOSE INTENDED — CONTRACTS.

The sale of a second-hand printing press for the purpose of printing a seven-column quarto newspaper, which purpose it would fulfill, may not be rescinded by the purchaser because it would not, suit the complainant in other particulars, not enumerated in the contract or mentioned at the time it was executed.

2. EQUITY—CROSS-BILL—RELIEF GRANTED.

In such suit to rescind the contract of sale, equity will relieve the defendant on a cross-bill, by a decree to compel the payment of the unpaid purchase price for the press, and of damages and costs, in order to finally dispose of the controversy.

Appeal from Montcalm; Davis, J. Submitted November 19, 1909. (Docket No. 115.) Decided March 5, 1910.

Bill by Elliott F. Grabill against Barnhart Brothers & Spindler to rescind a contract on the ground of fraud. Defendant filed an answer in the nature of a cross-bill for the specific performance of said contract. From a decree for complainant, defendant appeals. Reversed, and decree entered for defendant.

*N. O. Griswold* (*Ethelbert V. Grabill*, of counsel), for complainant.

*Kleinhans & Knappen*, for defendant.

MCALVAY, J. Complainant in this suit was the owner of a newspaper plant in Greenville, Mich. He contemplated increasing the size of the newspaper he published from a six-column quarto to a seven-column quarto, and

---

[1] Rehearing denied April 1, 1910.

to publish a daily paper of the seven-column size, and for that purpose needed a larger press. Defendant, an Illinois corporation, was doing business in Chicago, dealing in selling, among other things, second-hand printing presses. In April, 1907, complainant sent his son to Chicago to defendant to purchase a press on which to print a seven-column quarto newspaper. There is no dispute between the parties but that was the kind of press ordered. The son looked at a press which was represented to be of a capacity to fill the requirements desired, and an option was given upon it by defendant provided a check of $100 was remitted as soon as he returned to Greenville. This check was sent as agreed and was received by defendant. In the acknowledgment of this payment, written April 19, 1907, defendant stated:

"We have your order and contract for the 37 by 52 Cottrell, and we shall make the promptest possible shipment."

This was a second-hand press, sold to complainant for $1,100. The price of a new press of the size and kind was about $2,600. It was sold as a second-hand press to be rebuilt for the purpose desired.

It was shipped to Greenville and arrived in the month of July, 1907. Defendant's erector came to Greenville for the purpose of erecting the press, beginning such work on August 2, and completing it August 13, 1907. On this date the erector's report was made out describing the property as a second-hand 35 by 52 Cottrell press, and giving full details of the work done by him. This was indorsed by complainant as follows:

"The above report is correct, and the erection of the press is satisfactory.

"E. F. GRABILL,
"Proprietor.

"Signed August 13, 1907."

Afterwards, on August 19th, a contract of sale was entered into between the parties, as follows:

"Barnhart Bros. & Spindler, an Illinois corporation, of

Chicago, Cook county, Illinois, as first party, agree to sell E. F. Grabill of Greenville, Montcalm county, Michigan, the second party, and said E. F. Grabill agrees to buy of the said Barnhart Bros. & Spindler on terms hereinafter specified, the following goods and chattels, to wit:

"One (1) second-hand 35 by 52 Cottrell & Sons 2 revolution 4 roller printing press, air springs, rear delivery, with steam and overhead fixtures complete; the machine described being located in Greenville, Michigan.

"The said E. F. Grabill agrees to pay to Barnhart Bros. & Spindler for said machine the sum of eleven hundred dollars ($1,100) as follows."

The contract also provided as follows: The payments were $100 accompanying the order; $200 upon the arrival of the machine; $800 in twenty-five notes of $32 each, at 6 per cent. per annum, dated July 30, 1907, payable one each month after date. Title to the property was reserved in defendant until fully paid; complainant to keep the property insured for the benefit of defendant, and upon any default of complainant defendant was authorized to take possession of the property. On the same day the contract was signed, the second payment of $200 was made. The first note of $32, due August 30th, was paid by complainant.

After being erected, this press was first used to print a poster, and then was run for several weeks to print complainant's newspaper, which continued to be printed as a six-column quarto until about September 1st. The press was satisfactory for that work. Up to this time no attempt had been made by complainant to use it for the purpose of printing a seven-column quarto newspaper. About September 1st, complainant wrote relative to the "chases" furnished with the press. This letter we do not find in the record, but evidently, from the answer written September 3d, complainant had found fault because "quarto chases" had been furnished instead of "quadruple chases," and defendant's reply was that these "chases" were furnished as ordered. It appears that about September 9th complainant for the first time used

the press for the purpose of printing a seven-column quarto newspaper. On September 10th defendant answered at great length a letter of that date received from complainant. From its contents it appears that complaint was made as to the working of the machine, and defendant gave detailed instructions what to do in order to run the machine properly. This letter was answered, on September 12th, by complainant, as follows:

"Your unsatisfactory letter received and no relief has been afforded by it. Until a correction of the press is made by you we are obliged to refuse same. A sample of this week's paper is forwarded, * * * and it is impossible to do other with the margins than has been done on the exhibit."

This letter was received, but no copy of the paper. Defendant replied September 17th by letter, saying:

"* * * The press sold you was changed so it would print four pages of a 7-col. newspaper, and that was satisfactorily demonstrated in our shop before the press was shipped out. We are under no contract to make margins match the margins of any ready print sheet or anything else. There are thousands of papers printed with just such margins as this press will accommodate. We made no mistake, nor have we made any misrepresentation. If it is necessary to give you a practical demonstration of the fact that we have fulfilled our contract, we shall expect you to pay the expenses of whatever man is sent to make the demonstration."

On the next day complainant replied, stating that when the visit was made to Chicago he desired a seven-column quarto press and was assured the press inspected could be adapted to such sized newspaper, and further said:

" Now our claim is that an apron of sufficient size has not been put on the press. Using the chases that were furnished with the press, a 7-column quarto sheet can be printed, but we contend that your statement is absolutely false when you say 'there are thousands of papers printed with just such margins as this press will accommodate.'"

This letter referred to the " margins " and " chases " and

indicated general dissatisfaction.   It accepted the offer by defendant to show that the contract had been fulfilled, and it was claimed that one of defendant's salesmen had stated that the press was not right.   Accordingly, an expert was sent by defendant from Chicago to Greenville, who remained five days working on the press.   The day he returned to Chicago he received from complainant and his foreman the following certificate:

"GREENVILLE, MICH., Oct. 3, 1907.
"This is to certify that Mr. McAllister arrived here last Friday and looked over the Cottrell press which has given us so much trouble and remained here until Wednesday evening.   That he left the press in good working condition and satisfactory to us.
"JOHN B. GREENWAY,
"Foreman Independent Office.
"Approved:   E. F. GRABILL, Proprietor."

Upon his arrival in Chicago the expert made his report, and delivered the above-signed statement to defendant's office, from which, on the next day, October 4th, a letter was written to complainant:

"* * * Mr. McAllister has returned and reports that he has got you running and that the press meets with your approval as per your memorandum given to him.   We are very much gratified that it turned out all right, as we were sure it would if we had a chance to demonstrate it."

No reply was made to this letter.   Complainant wrote, October 17th, stating that he had notified the bank to return his note, because he had heard nothing from defendant in regard to the continuous blur on the outside columns which had never been remedied.   On October 26th, complainant, in reply to a letter of October 19th, wrote at considerable length giving his reasons for refusing payment on notes, as follows:

"We are not refusing payment on these notes to make money.   We are refusing payments because we have not the press we contracted for, that is, a press that will print our 7-column quarto in such manner as the Independent has always been printed.   * * *"

This is the last letter between the parties. Complainant retained and continued to use this press until the time of commencing this suit, December 4th, being about the date defendant had sent a representative to Greenville to take possession of the property.

This bill was filed for the purpose of "vacating, annulling, and setting aside" the contract, because procured by fraud and misrepresentation; to require the surrender and cancellation of the notes given as part of the purchase price of the press, for the same reasons; also requiring defendant to place complainant *in statu quo* and to return the $332 paid, and to pay all damage suffered. There was a prayer for general relief, and for an injunction to restrain defendant from bringing suit on the notes, and from proceeding to deprive complainant of the custody of the press "until defendant has complied with the terms of the final decree of the court in that regard." The injunction issued upon the filing of the bill of complaint and continues in force. Complainant continued to use the press after he brought suit and until he purchased another. Upon a hearing in open court, a decree was granted complainant according to the prayer of his bill. Defendant in this court urges that this record does not sustain the allegations of the bill, but, on the contrary, shows that complainant was not induced to enter into the contract by reason of false representations of defendant, and that the machine furnished did the work it was represented that it would do.

There is no dispute between these parties but that complainant desired a press which was large enough to print a seven-column quarto paper, and the proof is clear that the press furnished was the one complainant's son saw in Chicago, and the one which defendant rebuilt and shipped to Greenville and set up for complainant's use. Defendant admits in its brief that "there is no question but that it was represented by defendant that the press ordered and delivered would print a seven-column quarto." Complainant knew that this was a second-hand press, and "he insisted on one thing only, namely, that the press

should be suitable for the publication of a seven-column quarto." The determination of the fact whether or not such a press was furnished necessarily disposes of this case.

Complainant received the press and signed the contract in question August 19, 1907. He used the press for several weeks before he changed from a six to a seven-column paper, and claims then to have discovered that it would not do the work which both parties admit it was represented it would do. It does not appear that any other stipulation as to the capacity of the machine was made, at the time the order was given and the first payment made and the order accepted, than that it would be suitable for the publication of a seven-column quarto. It clearly appears from the record that complainant used what is known to the newspaper business as "patent insides;" that is, the inside pages of his paper were printed by some concern which furnished them to the trade, leaving the outside pages blank, which were printed in his office, and this was the kind of paper which he attempted to print on this press in question. It also appears that, when printing the blank pages of the "patent insides" on this machine, the margins left on the sheets did not correspond with the margins on the "patent insides" pages. It is not disputed but that this press as furnished will print a seven-column quarto paper with a one-inch margin and do the work well, and that many newspapers are published with that margin. Complainant's letter of September 18th, *supra*, says:

"Using the chases that were furnished with the press, a seven-column quarto sheet can be printed."

This was in answer to defendant's letter of September 17th, *supra*, which said:

"We are under no contract to make margins match the margins of any ready print sheet or anything else."

Complainant's son and the foreman both stated that this press would print with a one-inch margin without a blur.

It is apparent beyond dispute that the press was unsatisfactory to complainant because the margin was but one inch wide. The letter of October 26th, *supra*, emphasizes this:

"We are refusing payments because we have not the press we contracted for, that is, a press that will print our 7-column quarto in such manner as the Independent has always been printed."

This record has been read with care to find, if possible, that complainant, or any one on his behalf, at the time the order was given or the contract was signed, made any reference to the matter of the width of margin this press would make, and we find none. The first suggestion of such a requirement appears in the letter of complainant dated September 12th, *supra*. In the brief for complainant it is claimed that the letter from defendant of April 19th, where acknowledgment is made for the order "for the 37 by 52 Cottrell," indicates that a larger press than this 35 by 52 was in the contemplation of the parties. The record shows that no such size of that press was manufactured, and the whole testimony of complainant is to the effect that no sizes were considered, that "a press was wanted to print a 7-column quarto newspaper." If complainant had considered that a larger sized machine was required, his attention was challenged to the fact when the contract was signed and the erector's report indorsed. Both of these instruments described this press which was then in the possession of complainant as a "second-hand 35 by 52 Cottrell."

We find that the contract was not secured by fraud or false representation on the part of the defendant, and that the press furnished fulfilled all the representations made by defendant. The conduct of complainant, during all the time after the press was erected until he repudiated the contract, can only be reconciled with our conclusion. In the first place, he took no steps to test its capacity prior to making the contract, although requested so to do. After he claims to have discovered that the press was not

as represented, he acknowledged in writing that it was satisfactory, and he retained the property and used it in his business, holding it by injunction, until he saw fit to secure another press.

In this opinion we have not referred to many minor matters contained in this record, but have stated and discussed undisputed facts and the writings of the parties from which we determine the case.   Our finding upon the controlling question of fact in the case renders unnecessary any discussion of the right of complainant to the relief prayed, in view of his undisputed conduct above outlined, after his claimed discovery of fraud and misrepresentation.   Complainant having failed in establishing a right to rescind this contract, on the ground relied upon, or for any other reason, the question as to the disposition which the court should make of the case is presented.   Defendants' answer in the nature of a cross-bill prayed for a decree in its favor, for the amount of the balance of the purchase price of the press, and for damages and costs.   This court has recently applied the doctrine that such relief may be granted upon a cross-bill.   *Village of Frankfort* v. *Schmid,* 151 Mich., at pages 86 and 87 ( 114 N. W. 855), and same case in 155 Mich. 313 (118 N. W. 961).   This applies to cases similar to the one now under consideration, where a court of equity may do complete justice between the parties and finally dispose of a controversy.

The decree of the circuit court is reversed, and a decree will be entered in this court so declaring, and establishing the validity of the contract, determining the amount due thereon, with interest, granting the relief to defendant prayed by its cross-bill, and also that defendant recover costs of both courts.

HOOKER, MOORE, BROOKE, and BLAIR, JJ., concurred.